CP:MJR
F.#2004R02728

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

SHARWIN LILLY,
    also known as "Nigel Chester"
    and "Huey,"
KENT BRYAN,
    also known as "Rupaul,"
DERRICK BARTON,
MICHAEL BROWNE,
LESLYN CAMACHO,
HUBERT CLARKE,
    also known as "Dun Dun,"
WANDA DELOACH,
LENNOX HOBBS,
    also known as "Junior"
    and "Ronald Davis,"
RAWLE HOYTE,
TERRELL LASSITER,
ROCHELLE MARCUS,
TIMOTHY MCKENZIE,
    also known as "Spliff,"
SHELLY MCQUNE,
JERMAINE NICHOLSON,
MICHAEL REID,
TABESSA RODNEY,
RUEL SANDY,
SHAMIKA TAYLOR,
DERRICK WALTERS,
    also known as "Patrick Obermuller,"
CHRISTOPHER WEST,
    also known as "Tony,"
KENNETH WONG,
    also known as "Pops,"
"CHUBBY" LNU,
"FREDDY" LNU,
"GARFIELD" LNU,
"MOSES" LNU,
FNU LNU,
    also known as "Winsome Housen" and
FNU LNU-2,
    also known as "Joel Hernandez,

                Defendants.

- - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT
OF ARREST WARRANTS

(21 U.S.C. § 846)

2

EASTERN DISTRICT OF NEW YORK, SS:

JASON MOLINA, being duly sworn, deposes and says that he is a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, duly appointed according to law and acting as such.

Upon information and belief, in or about and between October 2003 and March 31, 2005, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants SHARWIN LILLY, also known as "Nigel Chester" and "Huey," KENT BRYAN, also known as "Rupaul," DERRICK BARTON, MICHAEL BROWNE, LESLYN CAMACHO, HUBERT CLARKE, also known as "Dun Dun," WANDA DELOACH, LENNOX HOBBS, also known as "Junior" and "Ronald Davis," RAWLE HOYTE, TERRELL LASSITER, ROCHELLE MARCUS, TIMOTHY MCKENZIE, also known as "Spliff," SHELLY MCQUNE, JERMAINE NICHOLSON, MICHAEL REID, TABESSA RODNEY, RUEL SANDY, SHAMIKA TAYLOR, DERRICK WALTERS, also known as "Patrick Obermuller," CHRISTOPHER WEST, also known as "Tony," KENNETH WONG, also known as "Pops," "CHUBBY" LNU, "FREDDY" LNU, "GARFIELD" LNU, "MOSES" LNU, FNU LNU, also known as "Winsome Housen" and FNU LNU-2, also known as "Joel Hernandez," together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved

3

five kilograms or more of a substance containing cocaine, a
scheduled II controlled substance, in violation of Title 21,
United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846 and
841(b)(1)(A)(ii); Title 18, United States Code, Sections 3551, et
seq.)

**A.    Qualificiations and Sources of Information**

1.    I have been a Special Agent with the Department of
Homeland Security, Immigration and Customs Enforcement ("ICE")
since March 2001. I am currently assigned to ICE's Narcotics
Smuggling Unit, at John F. Kennedy International Airport
("J.F.K."), Queens, New York.  During my tenure with ICE, I have
participated in numerous narcotics investigations during the
course of which I have conducted physical and wire surveillance,
executions of search warrants, and reviews and analyses of
numerous taped conversations and records of drug traffickers.
Through my training, education and experience -- which has
included debriefing numerous cooperating drug traffickers,
monitoring numerous wiretapped conversations of drug traffickers,
conducting numerous searches of locations where drugs and money
have been found, and conducting surveillance on numerous
occasions of individuals engaged in drug trafficking -- I have
become familiar with the manner in which illegal drugs are

4

imported and distributed, the method of payment for such drugs, the efforts of persons involved in such activity to avoid detection by law enforcement, including the use of coded language by those individuals in an effort to disguise the subject matter of their conversation.  I also have extensive experience in analyzing telephone records in narcotics investigations through the use of pen registers and telephone toll records.

2.    The facts set forth in this affidavit are based in part upon information that I have learned through a review of written documents prepared by, and conversations with members of ICE, the Drug Enforcement Administration (the "DEA"), officers of the Port Authority of New York and New Jersey Police Department (the "PAPD"), and other law enforcement agencies, and from a review of various documents obtained by subpoena, request or database searches.  More specifically, in the portions of this affidavit that describe intercepted wire communications, virtually all of the information, unless otherwise indicated, is based upon my review of line sheets and draft transcripts created by the monitoring agents who intercepted the phone call. Furthermore, in the portions of below that describe surveillance activities, all surveillance was conducted by officers assigned to ICE or DEA, including myself.  The observations of other involved law enforcement agents have been related to me to supplement the activities that I personally observed.

3.    In this Affidavit, I have described portions of certain telephone conversations that were intercepted during the course of court-authorized wire surveillance.  I have not, however, summarized every pertinent intercepted call, nor have I included every pertinent part of the call that I have summarized. Moreover, any transcripts or summaries of intercepted calls set forth in this Affidavit are preliminary in nature.  My opinions concerning the meaning of coded or veiled conversations are based upon my training and expertise developed as a result of investigating the distribution of controlled substances and my discussions with other experienced law enforcement officers.

4.    Unless otherwise indicated, identifications of individuals on intercepted communications in this investigation were made through name and voice identifications of the defendants made by law enforcement agents monitoring the wire interceptions.  Agents initially identified each interceptee through the interceptee's identification of himself or herself by name during the course of the conversation in conjunction with available telephone subscriber information.  Thereafter, agents would identify the interceptee through either the use of their name or voice identification based upon comparisons with prior interceptions of that individual.

5.    As set forth in the paragraphs below, I believe that there is probable cause to believe that the defendants are

6

involved in the trafficking of cocaine.[1]

**B.    The Organization**

6.    This investigation has been aimed at dismantling an organization that imports cocaine into the United States, primarily through John F. Kennedy Airport in Jamaica, Queens, New York.   This organization, centered around SHARWIN LILLY ("LILLY"), imports its cocaine into the United States from Guyana.   Typically, this organization hides the cocaine in seemingly legitimate cargo or uses airline passengers arriving from Guyana as cocaine couriers.

7.    As further detailed below, the organization then sells the cocaine to distributors in New York City.   The organization then remits part of the proceeds back to the cocaine sources in Guyana.   Based upon the investigation to date, agents have determined that the roles of the defendants are as follows:

a.    The defendant SHARWIN LILLY, is the leader of this organization and is responsible for the coordination of its cocaine importation and distribution activities.   During the course of this conspiracy, LILLY and this organization have been responsible for the importation and distribution of over 100 kilograms of cocaine into the United States.

––––––––––––––––––––

[1]    I have not set forth all the facts known to me about this investigation and case, but only those facts that appear to be necessary to establish probable cause to appear to me to be necessary to establish that the defendants committed the charged offenses.

b.     The defendants KENT BRYAN and LENNOX HOBBS work closely with LILLY in the importation of cocaine into the United States.  BRYAN serves as a recruiter and coordinator of the cocaine couriers used by the organization to ferry cocaine from Guyana into the United States. HOBBS assists in the coordination of incoming cocaine couriers and cargo.  BRYAN and LILLY also supervise the creation of phony businesses, which are used to import cocaine via cargo shipments into the United States.

c.     The defendant MICHAEL BROWNE is a supplier of cocaine to LILLY and the organization.   Additionally, BROWNE serves as a money launderer for the organization, sending payment to the organization's overseas cocaine suppliers.  The defendant ROCHELLE MARCUS, BROWNE's paramour, is the organization's bookkeeper.  The investigation has shown that MARCUS keeps records concerning monies that are remitted to the overseas cocaine suppliers on behalf of the organization.

e.     The defendant WANDA DELOACH assists LILLY and BRYAN in recruiting couriers and coordinating the courier's trips to Guyana.

f.     The defendant TERRELL LASSITER is a Virginia-based customer of LILLY's organization.   The investigation shows that LASSITER comes to New York City from Virginia and purchases cocaine from LILLY, which he pays for by providing LILLY with guns.  The investigation has also revealed that LASSITER takes

8

cocaine purchased from LILLY and brings it to Virginia, where he sells the cocaine to his own customers.

g.   The defendant HUBERT CLARKE is a Guyanese-based supplier of cocaine to the LILLY organization.  CLARKE was previously indicted by a grand jury in this District in February 2004 for his activities as an importer and distributor of cocaine in Brooklyn and Queens, New York.  CLARKE's paramour, SHELLY MCQUNE and CLARKE's sister-in-law, LESLYN CAMACHO, assist in CLARKE's activities and have served as his representatives in the United States.

h.   DERRICK WALTERS, also known as "Patrick Obermuller," and MOSES LNU serve as intermediaries between LILLY and many of LILLY's Guyanese cocaine suppliers.

i.   DERRICK BARTON, TIMOTHY MCKENZIE, CHRISTOPHER WEST and KENNETH WONG, also known as "Pops," serve as narcotics distributors for LILLY's organization.

j.   RAWLE HOYTE, JERMAINE NICHOLSON, MICHAEL REID, CHUBBY LNU, FREDDY LNU, GARFIELD LNU, FNU LNU, also known as "Winsome Housen," and FNU LNU-2, also known as "Joel Hernandez" are customers of LILLY's organization.

k.   TABESSA RODNEY and RUEL SANDY work for LILLY as runners of drugs and drug proceeds.

l.   SHAMIKA TAYLOR has picked up cocaine at J.F.K. for the organization.

C.    **The Investigation**

I.    THE ORGANIZATION SHIPS COCAINE FROM GUYANA IN CARGO

8.    On May 15, 2004, the ICE office at J.F.K. received notification from the United States Embassy in Georgetown, Guyana that on that day a shipment containing approximately 50 kilograms of cocaine was seized at Timehri International Airport in Georgetown, Guyana.  The cocaine was concealed in a shipment of frozen fish and was destined for J.F.K. Airport aboard Universal Airlines Flight 102.

9.    ICE agents subsequently obtained the airway bill from Universal Airlines concerning the cocaine laden shipment that had been intercepted in Guyana.  An airway bill is a document used in the air cargo business in connection with the transportation of cargo.  It contains information provided to the air cargo company by the sender of the cargo.  This information usually includes the name, address and telephone number for the shipper and the consignee (the intended recipient). It is also my understanding and experience that it is the standard practice of air cargo companies to record the name and identifying information of the person picking up the freight.

10.    The airway bill for the shipment intercepted in Guyana indicated that an individual named Collin Smith was the shipper and that the consignee was "Eye & Eye Produce," 795 Flatbush Avenue, Brooklyn, New York.  The document further

indicated that Eye & Eye Produce could be reached at (718) 284-8474.

11. Research and an in-person visit to 795 Flatbush Avenue, Brooklyn, New York revealed that "Eye & Eye Produce" is a fictitious name. ICE agents who went to that location found a Chinese restaurant. The owner of the restaurant informed the agents that he had operated the restaurant at that location for approximately two years, and that he had no knowledge of "Eye & Eye Produce." The owner of the restaurant further stated that he purchased fish for his restaurant from a wholesaler in New York, New York, not Guyana. A search of the Lexis/Nexis computer database of corporate and d/b/a records in New York State did not find a match for "Eye & Eye Produce."

12. I conducted research into cargo shipments of frozen fish that had arrived at J.F.K. Airport from Guyana between December 2003 and May 2004. During that time period, five shipments arrived at J.F.K. containing frozen fish to be shipped to "Eye & Eye Produce." Shipping records further indicated that four of these shipments were picked up by the defendant LENNOX HOBBS ("HOBBS"), while the name of the person who picked up the remaining shipment was not listed.

13. Further research into these shipping records indicates that on or about December 9, 2003, HOBBS was both the consignee and pick-up person for a shipment of frozen fish that

arrived at J.F.K. Airport via Universal Airlines.  On those documents, LENNOX HOBBS provided (917) 968-7038 as his telephone number.  I have subpoenaed records from Verizon Wireless concerning that telephone number, and these records indicate that at that time, (917) 968-7038 was assigned to account number 109861741 and the account holder was LENNOX HOBBS, 460 East 21st Street, Brooklyn, New York 11226.

14.  Verizon Wireless has further informed me that in or about July 2004, LENNOX HOBBS changed the address on account number 109861741 to 290 Congress Avenue, Rochester, New York and also changed the telephone number on the account from (917) 968-7038 to (585) 880-6466 (the "HOBBS TELEPHONE").

15.  A further examination of telephone toll records showed that during the time period that these cargo shipments were arriving in the United States, HOBBS made multiple telephone calls to LILLY at (718) 637-3165 ("LILLY PHONE-1"), which is subscribed to LILLY at 241 East 32nd Street, Brooklyn, New York.

16.  Toll record further reflect call activity between the HOBBS TELEPHONE and LILLY PHONE-1 for each of the identified cargo shipments.  For example, toll records for LILLY PHONE-1 show that between December 8, 2003 and December 9, 2003, eight calls were made from that phone to (917) 968-7038, the predecessor to number to the HOBBS TELEPHONE.  Based upon the investigation to date, the I believe that the other, identified

cargo shipments also contained cocaine.

II.   THE TITLE III INTERCEPTIONS OF WIRE COMMUNICATIONS

17.   This investigation has included the court-authorized interception of wire communications in this District on telephones used by the defendant LILLY, as set forth below.

18.   On January 12, 2005, U.S. District Court Judge Frederic Block, Eastern District of New York, signed an order authorizing the interception of wire communications over LILLY PHONE-1.[2]   Interceptions of LILLY PHONE-1 began on January 13, 2005 and continue.

19.   On February 8, 2005, the Honorable Frederic Block, United States District Judge for the Eastern District of New York, signed an order authorizing the interceptions of calls to and from (347) 228-4022 ("LILLY PHONE-2")[3].   This phone is subscribed to by Serena Carrington, 136 St. Paul's Place, Brooklyn, New York.   However, this investigation revealed that LILLY PHONE-2 is used exclusively by LILLY.   Interceptions began on February 8, 2005 and continue.

20.   Based upon my training and experience, I believe

_____

[2]   On February 11, 2005, U.S. District Judge Sandra L. Townes, Eastern District of New York, signed an order authorizing the continued interception of calls to and from LILLY PHONE-1. On March 11, 2005, Judge Block authorized the continued interception of calls to and from LILLY PHONE-2.

[3]   On March 11, 2005, Judge Block authorized the continued interception of calls to and from LILLY PHONE-2.

13

that the below-described telephone conversations, intercepted over LILLY PHONE-1 and LILLY PHONE-2, as indicated, are in furtherance of drug trafficking and other criminal activities of the defendants and their associates.[4]

    III.  <u>PROBABLE CAUSE TO ARREST THE DEFENDANTS</u>

        A.   The Attempted Narcotics Importation
            Of February 27, 2005

    1.  In one instance, interception of calls over LILLY's phone resulted in the arrest of a courier attempting to import narcotics into the United States.  On February 21, 2005 at approximately 11:41 a.m., LILLY and WANDA DELOACH discussed the courier:

> DELOACH:  Alright, she got on. She got black.
>
> LILLY:     Black..black.
>
> DELOACH:  She's got black hair.
>
> LILLY:     Oh, black hair. What color jeans?
>
> DELOACH:  Regular jeans.
>
> LILLY:     What color jeans?
>
> DELOACH:  Regular jeans, and a jeans jacket and a black
>             leather coat.

---

   [4]    Not all relevant calls intercepted over the above-identified telephones are described herein. Moreover, many of the calls have been presented in substance and in part. To the extent that transcripts and quotations are used in descriptions below, the quoted segments of referenced calls are based upon line sheets, reviews of recordings and preliminary transcripts. Also, all dates and times are approximate and based upon the monitoring equipment at the time the call was intercepted.

LILLY:    Okay, blue jeans?

2.    Two minutes later, at 11:43 a.m., LILLY received
the following call over LILLY PHONE-2 from an unknown female
("UF-1") regarding the courier:

UF-1:    Okay, I didn't hear from you last so I am
         just calling (to) see if anybody come.

LILLY:   [Laughing] You waited for me last night?
         Aah...black jeans, black leather jacket, hair
         is black. You know...You're going to
         recognize she (her) because she came before.

UF-1:    Which one?

LILLY:   Aris.

UF-1:    Okay, when is she coming, this morning?

LILLY:   She is going to reach down there two forty.

UF-1:    Today?

LILLY:   Uh-huh.

UF-1:    Okay then.

LILLY:   Well, the flight (is) leaving in about four
         minutes.

UF-1:    Okay.  alright thanks,  later.

LILLY:   Uh.. bye.

3.    Based upon my training, experience and the
investigation to date, I believe that these two phone calls
concerned a narcotics courier who was traveling to Guyana.  In
the first conversation, DELOACH identified the possible courier

by a physical description ("She's got black hair") and a
description of the clothing she was wearing ("Regular jeans, and
a jeans jacket and a black leather coat").   In the second phone
call, which occurred just two minutes later, I believe that the
UF-1 was calling on behalf of individuals in Guyana who were
awaiting the courier's arrival ("I am just calling (to) see if
anybody come" and "She is going to reach down there two forty").
LILLY then identified the courier by name ("Aris"), provided her
physical description ("Aah...black jeans, black leather jacket,
hair is black"), and reminded the UF-1 that Aris has acted as a
courier before ("You're going to recognize she (her) because she
came before").

      4.   LILLY discussed Aris' impending return to the
United States with DELOACH in a phone call over LILLY PHONE-2 at
1:21 p.m. on February 21, 2005:

> DELOACH:   Call me when you get up.  This is a very
> important call.  You hear me?
>
> LILLY:   Yeah baby.
>
> DELOACH:   Make sure you call me when you get up, Nigel.
>
> LILLY:   You could talk to me now!
>
> DELOACH:   Oh, Oh, Oh.  Do you think I'm going to do my
> thing (unintelligible) this week?
>
> LILLY:   (Laughs)
>
> DELOACH:   I am serious.  You just call me for Aris.  I
> know that was what you did.
>
> LILLY:   Sweetheart, Sweetheart.

DELOACH:   What do you want?

LILLY:   I am not playing with you, you know. When I
call you and put you on standby, it was
definitely standby. I spoke to them this
morning. So it is probably definitely this
week. Don't worry!

DELOACH:   I owe...

LILLY:   (Voice overlap)

DELOACH:   I need six hundred ($600.00) dollars.

LILLY:   (Voice overlap) I did not just call you for
Aris.

DELOACH:   I need six hundred ($600) dollars that is
what I want.

LILLY:   (Voice overlap) Those people will be calling
you...calling me back tomorrow, to let me
know.

    5.   During this conversation, I believe that LILLY and

DELOACH were again discussing Aris. I further believe that Aris

was recruited by DELOACH and that DELOACH was demanding immediate

payment for her recruiting services ("I need six hundred

dollars"). However, LILLY told DELOACH that she had to wait

("Those people will be calling you...calling me back tomorrow, to

let me know"), perhaps to see what would happen with Aris' return

trip to the United States.

    6.   Based upon the information in these phone calls,

ICE agents were able to identify "Aris" as Aris S. Barrett

("Barrett"). Through a review of ICE records, the agents were

able to determine that Barrett was returning to the United States

from Guyana on February 27, 2005 on BWIA Airlines Flight 424.
Upon her arrival at J.F.K. Airport in Queens, New York, Barrett
was inspected by ICE inspectors, and at that time the inspectors
found approximately 4.07 kilograms of cocaine strapped to
Barrett's body.  Barrett was immediately arrested by ICE agents.

7.  Additionally, while Barrett was being inspected by
ICE inspectors, ICE agents, including myself, were conducting a
surveillance of the lobby of Terminal 4 at J.F.K. Airport, where
Barrett was due to disembark upon her arrival.  While conducting
that surveillance, I saw a person that I believe to be LILLY
waiting in the Terminal 4 lobby.  My identification of LILLY is
based upon a comparison with a mugshot made in connection with a
prior arrest of LILLY by the Custer County Sheriff's Office,
Arapahoe, Oklahoma.

B.   LILLY and BRYAN Try to Find BARRETT
     After Her Arrest

8.  On March 1, 2005, two days after Barrett's arrest,
at approximately 1:19 p.m., LILLY used LILLY PHONE-1 to make a
call to BRYAN at (954) 599-4255.  During that call, LILLY gave
BRYAN a telephone number ("7-1-8-8-4-0-4-2-0-0") and LILLY then
arranged for a three-way conference call to that number.  I know
that (718) 840-4200 is the main telephone number for the
Metropolitan Detention Center in Brooklyn, New York, the primary
holding facility for federal prisoners in this District, where
BARRETT was held after her arrest.  In the above conversation,

BRYAN called the MDC, with LILLY on the line, to determine

BARRETT's location and status.  However, it appears that BRYAN

was spelling BARRETT's name incorrectly (with an "E" at the end),

so they were unable to confirm her whereabouts.

### C.   LILLY Conducts Narcotics Business with HUBERT CLARKE

26.   In January 2004, ICE agents arrested Alex Mingo

and HUBERT CLARKE ("CLARKE") on narcotics importation and

distribution charges filed in this District.  CLARKE was released

on bail by U.S. Magistrate Judge Lois Bloom on January 20, 2004,

but violated his bail conditions by fleeing the United States on

or about February 19, 2004.  In February 2004, the grand jury

returned an indictment against Mingo and CLARKE, charging them

with cocaine importation, cocaine distribution and conspiracy to

import and distribute cocaine.  Mingo was tried before U.S.

District Judge Charles P. Sifton in July 2004 and found guilty of

all charges.  Mingo is awaiting sentencing, but CLARKE remains a

fugitive.

27.   On February 22, 2005, at approximately 10:32 a.m.,

LILLY used LILLY PHONE-2 to call CLARKE, who also is known by ICE

agents to use the name "Dun-Dun," at (592) 612-9783.  No

subscriber information is available, since this number is in

Guyana.  During this conversation, LILLY and CLARKE discussed a

drug courier (a "car") in coded language.

28.  In the beginning of this conversation, LILLY and CLARKE talk about the "car reach...reach the parking lot." Based upon the agents' training, experience and their understanding of codes used by these narcotics traffickers, it is believed that the "car" referenced the courier, and that it was headed to the "parking lot," believed to be a reference to Guyana..  Indeed, later in the conversation, LILLY talks about "four cars coming next week," which is believed to be a reference to additional couriers.  CLARKE and LILLY also talked about how they "want twenty-one for one."  LILLY also stated that "if they go to twenty, I will deal with it, but not twenty-one."

29.  Additionally, Clarke talks about whether "Shelly tell you last night."  Based upon my knowledge of this investigation and conversations with other ICE agents, it is believed that this was a reference to SHELLY MCQUNE ("MCQUNE"), known to be CLARKE's girlfriend.  MCQUNE also served as a suretor on CLARKE's bail bond at the time of his release in February 2003. Additionally, as detailed below, ICE agents have intercepted calls over LILLY PHONE-2 where MCQUNE and LILLY discussed narcotics transactions.

30.  Based upon my training, experience and knowledge of the narcotics trade, it also appears that LILLY and CLARKE were discussing drug price and quantities.  "They want twenty-one for one" is believed to be a sale price, $21,000, for one

kilogram of cocaine.  LILLY and CLARKE further discussed the
location of the source of the cocaine, Queens, and the fact that
LILLY thought that the price should be $20,000, not $21,000 ("If
they go twenty I will deal with it but not no twenty-one").

 31.  In addition to discussing drugs, it appears that
in this phone call CLARKE and LILLY are discussing a gun that
LILLY recently purchased, detailed below, and the fact that LILLY
would use it if necessary ("you understand I don't like to I am a
mad man, I just buy a new fucking gun too nice, [Inaudible]
Bryco, it got night vision on").   Bryco is known to the ICE
agents as a manufacturer of handguns, while "night vision" is a
type of laser gun scope.

    D. LILLY Conducts Narcotics
     <u>Business with SHELLY MCQUNE</u>

 32.  On February 17, 2005, at 4:54 p.m.,  LILLY
received a call on LILLY PHONE-2 from MCQUNE, who was calling
from (347) 789-8615.  During this call, MCQUNE asked LILLY if
"we're going to be ready for anything at all."  In response,
LILLY told MCQUNE that he was not ready for anything.  LILLY told
MCQUNE that he called "Dun-Dun" (CLARKE), but didn't get CLARKE.
LILLY told MCQUNE that CLARKE should stop telling people that
LILLY robbed him.

 33.  Based on my training, experience and knowledge of
this investigation, I believe that LILLY and MCQUNE were
discussing a possible narcotics transaction with MCQUNE ("ready

21

for anything at all").   The conversation then segued into a
discussion of problems concerning past transactions with CLARKE.

E.   MCQUNE Assists in BARRETT's Narcotic Trip

34.  On February 17, 2005, at 3:25 p.m,  LILLY received
a call on LILLY PHONE-2 from MCQUNE, who was calling from (347)
789-8615.  During that call, MCQUNE asked LILLY if he talked to
the "people down there." They then discussed what LILLY, wanted
"her to fly with." The subsequent discussion included
conversation concerning Amerijet, "Uni," North American and BWIA.
LILLY and MCQUNE conclude the conversation talking about tickets,
with LILLY stating that he didn't buy people's tickets.

35.  On February 19, 2005, at 3:36 p.m., a call between
LILLY and MCQUNE was intercepted over LILLY PHONE-2.  During that
call, LILLY told MCQUNE that the travel agency closed at 4 p.m.
MCQUNE asked LILLY if it was with North American, and LILLY
responded, "No, with Bee Wee."

36.  Based upon my training, experience and knowledge
of the investigation, I believe that this conversation involved
arrangements for the travel of Barrett to Guyana.   In the first
conversation, it appears that the cocaine sources in Guyana
wanted to know what airline Barrett is flying with.  They then
discuss three airlines that fly to Guyana, Amerijet[5], "Uni"

---

[5]       The reference by to Amerijet is notable as it
relates to CLARKE.  Amerijet is a cargo-only airline.  In the
scheme for which CLARKE was indicted in February 2004, CLARKE and

(believed to be slang for Universal Airlines) and North American. In the second conversation, they discuss these details further, and decide that they are using "Bee Wee," which is popular slang in the Carribean for BWIA Airlines.

37.   The interpretation of these calls is supported by another call from MCQUNE to LILLY on the SUBJECT TELEPHONE on February 20, 2005 at 2:31 p.m.   In that conversation, MCQUNE asked LILLY of the "girl went off alright." LILLY confirmed, stating that she had left on "Bee Wee 425."   An examination of Barrett' travel records indicates that she departed from J.F.K. Airport to Guyana on February 20, 2005 on BWIA Flight 425.

F.    Cocaine Concealed in a Shipment of Chow Mein
      Noodles Is Seized at J.F.K. Airport

38.   On March 2, 2005, at 6:18 p.m., LILLY received a telephone call on LILLY PHONE-2 from an individual who had previously identified himself in other telephone calls as "DAVID."   During that call, DAVID told LILLY that he was giving him the "registration number."   DAVID then told him that the information for tomorrow was "60 boxes," "cargo box."   DAVID then asked LILLY to confirm if a number, 347-881-6363, was still working, and LILLY confirmed that it was.

---

his co-conspirators used cargo shipments of fish, shipped via
Amerijet from Guyana, to smuggle cocaine into the United States.
This is similar to a smuggling scheme which is used by this
organization in the instant case.

39. Based upon this telephone call and other information developed in this investigation, we determined that these traffickers were sending up a cargo shipment from Guyana containing cocaine. Investigation revealed that a cargo shipment containing 60 cartons of chow mein noodles was being shipped from Guyana via North American Airlines was scheduled to arrive in New York on March 3, 2005. The listed consignee (recipient) was a company known as Impulse Trading Company using a telephone number of 347-881-6363, the number recited by DAVID in the call described above. The 60 cartons ("60 boxes") and the telephone number provided are the same described in the above referenced conversation.

40. Upon arrival at J.F.K., this cargo shipment was searched by U.S. Customs and Border Protection inspectors and ICE agents. The cargo shipment was found to contain approximately 5 kilograms of cocaine secreted in the cardboard boxes. At the direction of ICE agents, the shipping company was instructed to tell whoever came to pickup the cargo that it had been quarantined by the U.S. Department of Agriculture due to insect infestation. This was done in an effort to protect the ongoing investigation.

41. On March 4, 2005, at approximately 1 p.m., ICE received a telephone call from Customs and Border Protection Inspectors indicating that an unidentified male ("UM-1") had

attempted to pick up this cargo, but that UM-1 was informed that the cargo was being held and destroyed due to insect infestation. On March 4, 2005, at approximately 3:18 p.m., LILLY received a telephone call from an unidentified male ("UM-2").  During that call, LILLY told UM-2 that the "the FDA seized the entire cargo," and that they "want to destroy everything in the incinerator."

42.  Based upon my training, experience and the investigation to date, I believe that LILLY was informing UM-2, a co-conspirator, about the cover story provided to him.  Thus, it appears that LILLY was awaiting this cocaine-filled cargo shipment, but was unable to take delivery once it was intercepted by ICE.

43.  In furtherance of this investigation, on March 8, 2005, at about 10:00 a.m. an undercover ICE agent placed a monitored call to 347-881-6363,  the telephone number on the air way bill for Impulse Trading Company.  The undercover ICE agent identified herself as "Lucy Mendez," an employee of Customs and Border Protection working with the Department of Agriculture. The individual who answered the phone for Impulse identified himself as "Ronald Davis."  However, this voice was recognized to be that of HOBBS.  The undercover agent informed HOBBS that the shipment was seized and destroyed due to insect infestation. HOBBS asked the undercover agent to fax him paperwork relating to

cargo shipment.  The undercover agent agreed and faxed the paperwork to HOBBS at (718) 282-4767.

44.  At approximately 11:53 a.m., LILLY used LILLY PHONE-2 to make a call to (917) 554-6644, which is subscribed to by LESLYN CAMACHO.  During the call, CAMACHO provided LILLY with a fax number.  A review of telephone subscriber information indicates that the fax number, (212) 963-3489, is subscribed to by the United Nations, where CAMACHO is employed.  Thus, CAMACHO was asking LILLY to fax some documents to her at work.

45.  Eight minutes later, at 12:01 p.m., LILLY used LILLY PHONE-1 to call CAMACHO.  During that call, LILLY asked CAMACHO if she had received "it," apparently referring to the fax.  CAMACHO told LILLY that "it," again referring to the fax, did not come out clearly.  LILLY stated that he would fax it again.  In response, CAMACHO told LILLY that only the information about the packages being destroyed and the insurance information came through clearly.

46.  Based upon my training, experience, the investigation to date, and the timing of these calls, I believe that the calls between CAMACHO and LILLY concerned the seized cocaine shipment.  Just after the undercover ICE agent faxed HOBBS the documentation showing that the chow mein noodle shipment was destroyed, LILLY called CAMACHO and faxed her

information concerning the packages.  I believe that CAMACHO is a representative of the Guyanese cocaine source.

47.  My belief concerning CAMACHO's role in the offense is further bolstered by her relationship to HUBERT CLARKE. CAMACHO is known to be CLARKE's sister-in-law, and like MCQUNE, she was a suretor on CLARKE's bail bond.

> G.   LILLY Sells Cocaine to, and
>      Purchases Guns from TERRELL LASSITER

48.  Our investigation has revealed that TERRELL LASSITER ("LASSITER") purchased cocaine from LILLY and sold firearms to LILLY.   Our investigation reveals that LASSITER resides in Virginia Beach, Virginia.

49.  On February 11, 2005, at approximately 3:27 p.m., a call from LILLY PHONE-2 to 757-737-9339, a telephone subscribed to LASSITER, was intercepted.  During that call, the following conversation took place:

> LASSITER: OK, hold on.  Let me...  let me get my other
>           phone and write them down.  [Inaudible]
>
> LILLY:    I'm saying, numbers as in pricing down there.
>
> LASSITER: As in... as in what now?
>
> LILLY:    Prices!  Prices!  Prices!
>
> LASSITER: Okay, okay, okay.
>
> LILLY:    Alright?
>
> LASSITER: Yeah.  Go ahead.
>
> LILLY:    These numbers always open now?  What is the
>           number here?

LASSITER: This number here?

LILLY:    Yeah, 'but find the number for one [1]...
          the number for one-two-five [1-2-5], and
          everything like, that two fifty [2-50], you
          know?  Eight ball sixteen and find...

[Conversation heard in background]

LASSITER: Huh uh

LILLY:    Right?

50.  Based upon my training, experience and the
investigation to date, I believe that LASSITER was calling LILLY
to obtain prices on various quantities of narcotics.  I believe
that the numbers, such as "1," "125" and "250" were references to
one kilogram, 125 grams and 250 grams, respectively.  Also, an
"eight ball" is a well-known street slang for 1/8 of an ounce of
cocaine.

51.  Other intercepted calls indicate that LILLY was
seeking to purchase firearms from LASSITER.  For example, on
February 12, 2005, at approximately 9:06 p.m.,  LILLY used LILLY
PHONE-2 to call LASSITER at 757-737-9339.  During that call,
LILLY asked LASSITER to check about some "Taurus double action
9mm" for him and also how much the "hydro-shock bullets" cost.
LASSITER told LILLY he would see if his man can let him know or
whenever he goes by the spot he can check it out for himself and
call and let LILLY know the prices.

52.   Based upon my training, experience and the investigation to date I believe that this conversation concerned guns.  I know that a "Taurus double action 9mm" is a type of handgun.  Thus, it appears that LILLY and LASSITER were negotiating the purchase of a gun.

53.   These conversations continued.  For example, on February 21, 2005, at about 12:49 p.m., LASSITER used his phone to call LILLY on LILLY PHONE-2.  During the call, LILLY and LASSITER were discussed an impending trip by LASSITER by bus to New York.  Furthermore, LASSITER indicated that he was bringing guns ("joints") but not the "Taurus" they previously discussed.  Based upon this and other information obtained in this investigation, ICE asked the Virginia Beach Police Department ("VBPD") to identify the bus that LASSITER was traveling on, and attempt to question LASSITER.   On February 22, 2005, a member of the VBPD found LASSITER boarding a bus to New York.  At that time, a VBPD detective asked LASSITER's consent to search his bag and person, but LASSITER refused.

54.   LASSITER later arrived in New York, as confirmed by a call from LASSITER to LILLY at LILLY PHONE-2 at 7:16 a.m. on February 22, 2005.  During that call, LASSITER said that he was in Manhattan and needed directions to LILLY's home.

55.   The transaction was conducted successfully, as demonstrated by a call received on LILLY PHONE-2 from KENNETH WONG at approximately 10:02 p.m. on February 22, 2005:

> LILLY:   Yeah
>
> WONG:   Hey, is what type ... what type is the ah ... thing the man bring up for you?
>
> LILLY:   Huh?
>
> WONG:   What type is it?
>
> LILLY:   [unintelligible] nines.
>
> WONG:   Oh nine?
>
> LILLY:   Uh-huh
>
> WONG:   Alright, cool.

56.   Based on my training, experience and the investigation to date, I believe that WONG was asking what type of gun (the "thing") that LASSITER ("the man") brought up.  LILLY responded by stating that LASSITER had brought up a 9 mm handgun ("nine").

57.   The investigation also indicates that LASSITER purchased cocaine from LILLY during that trip, perhaps in exchange for the gun.  The day after LILLY received the gun, February 23, 2005, at approximately 5:35 p.m., LILLY received a call from LASSITER on LILLY PHONE-2.  During that call LASSITER told LILLY that it was some really good "cake," that the "people" liked it, so he will be calling LILLY back real soon.  LILLY told

30

him that he would not make LASSITER come all this distance and give him "garbage."

58.   Based upon my training, experience and the investigation to date, I believe that "cake" was a reference to cocaine, while "garbage" was a reference to poor quality cocaine.   I believe that LASSITER was telling LILLY that his customers ("people") were happy with the quality of the cocaine, to which LILLY replied that he would not have made him travel from Virginia for "garbage."

H.   <u>TABESSA RODNEY Is Identified as a Runner for LILLY</u>

59.   The investigation has also identified another co-conspirator, TABESSA RODNEY ("RODNEY"). It is believed that RODNEY delivers drugs and/or money for LILLY. For example, on January 15, 2005, at approximately 5:08 p.m., LILLY used LILLY PHONE-1 to call RODNEY at a telephone subscribed in her name at (832) 816-3568 (the "RODNEY TELEPHONE").   During that conversation, LILLY stated that "we have do get something from the store."   RODNEY replied "He didn't call me yet."   LILLY then stated that "He didn't call you yet because you should have gotten someone to collect it, that's good."   The conversation continued, and RODNEY asked "What are you saying?"   LILLY says, "No, when you are done with him, bring it down with him."   RODNEY states, "He ain't call me though." The conversation continued and LILLY asks "Why don't you call him and ask him where's (inaudible). . . tell him you are outside?"   RODNEY hissed in

31

response.  LILLY then asked, "We are collecting our money.
Right?" to which RODNEY responds, "Oh, it seems like somebody to
go for it?"  LILLY then states, "Yeah, that's when he just call
me to tell me to get somebody. . . " RODNEY replied by asking,
"Still give him the card?  The phone card?"  LILLY answered, "No!
Hell no!"  RODNEY then said, "No, man, just call him.  I want you
[to] get your little money.  Call him, tell him that you are
downstairs."

      60.  Subsequently, LILLY offered to put RODNEY on the
line with another individual on a three-way call.  Although the
number on the three-way call was not recorded on the pen
register, the conversation was captured.  In this call, RODNEY
says to an unidentified male, ("UM-1"), that "I brought come
phone cards for you.  I am downstairs."  UM-1 responded by
saying, "Alright then, I will be downstairs in like five
minutes.".

      61.  Immediately thereafter, at 5:08 p.m, RODNEY called
LILLY back.  RODNEY told LILLY that she was not sure why she
called back.  LILLY laughed and says, "Well, this guy get
something for me still, so when you're done, please come and get
me and I could go and get there." RODNEY and LILLY then discussed
when and how she was leaving.  Eventually, LILLY stated, "All you
do is get your ahm. . . your . . . tapes they want sell me for
you thing, right?"  RODNEY agreed, and LILLY told her to tell him
to let him know when she was going.

62.   Based upon my training and experience in codes and methods of operation used by this narcotics trafficking group, I believe that the conversations described above between LILLY and RODNEY over LILLY PHONE-1 concerned narcotics.  It appears that RODNEY was running a drug related errand on LILLY's behalf. RODNEY was sent to collect money ("get something from the store" and "we are collecting our money") from a supplier in exchange for drugs ("calling cards").  RODNEY and LILLY were discussing the details of how the money was to be collected.  LILLY then put RODNEY on the phone with the supplier to work out the details of the pick up.  In the subsequent phone call, they confirmed that RODNEY would complete the errand, and begin to discuss another deal ("get your ahm. . . your . . tapes they want sell me for you thing, right?").

I.    KENNETH WONG Is a LILLY Distributor

63.   During the course of the interceptions of the SUBJECT TELEPHONE, the agents have identified KENNETH WONG, also known as "Pops," who they believe is a street-level drug seller for LILLY.

64.   For example on February 13, 2005, at about 6:36 p.m., LILLY received a call on LILLY PHONE-1 from WONG, who was calling from 646-436-3268, which is subscribed to by Zantha Springer.  During this call, the following conversation was intercepted:

LILLY:   Yo.

33

WONG:      Yo, where are you at?

LILLY:     Taking care of something.

WONG:      Hmm?

LILLY:     I am taking care of something. What, you need
           me?

WONG:      No, I need to get some paper from today.

LILLY:     Alright, I know...I know, well you see I
           didn't reach by you yet so. Just give me a
           little time, right?

WONG:      Like your doing...like you are getting more
           things.

LILLY :    Right.

WONG:      Alright, right do your thing.

LILLY:     Good.

65.  Based upon my training, experience and

understanding of the codes used by this narcotics trafficking

group, it is believed that the reference to "paper from today" is

a reference to narcotics proceeds collected by WONG. This

interpretation of the code is supported by a call made by WONG

from 646-436-3268 to the LILLY PHONE-2 just two hours later, at

approximately 8:38 p.m. on February 13, 2005, during which WONG

stated that he was going to LILLY's to drop off money:

LILLY:     Yeah, Pops.

WONG:      Yeah, I am coming by you to bring you this
           money.

LILLY:     Alright.

WONG:      Come down stairs in two minutes.

LILLY:      Excuse to come out your house.

WONG:       I am coming out side now, I am going to come
            by you now.

LILLY:      Alright. Yeah.

66.  The fact that WONG had dropped off money to LILLY
is confirmed by a call from the LILLY PHONE-2 to WONG at 646-436-
3268, just nine minutes later, at 8:47 p.m. on February 13, 2005:

WONG:       Yo.

LILLY:      Fourteen.

WONG:       How much?

LILLY:      Fourteen.

WONG:       Fifteen?

LILLY:      Fourteen.

WONG:       Oh "skunt" son there got to be fifteen Nigel,
            check back there man.

LILLY:      Hold on, I am gong to check right now.

WONG:       You got to..there...well there is more
            problem now. Because.

LILLY:      I am not going nowhere.

WONG:       No, I know you are not going no where. But I
            am just saying. (Inaudible) fifteen, I know
            there supposed to be fifteen there.

LILLY:      Twenty..twenty, thirty, fourty, fifty, sixty,
            seventy, eighty, ninety,
            one hundred. Alright.

WONG:       First one there is like ten and five.

LILLY:      Right. Hundred.

WONG:       Fifteen, right?

LILLY:      One, two, three, four, five. (Inaudible) One,
            two, three, four, five, six, seven, eight,
            (Inaudible) (Sound of counting money).
            (Inaudible) One, two, three, four, five, six,
            seven, (Inaudible) right, sorry, fifteen.

WONG:       Yeah, yeah, alright. (Inaudible)

LILLY:      (Laughs)

WONG:       I got to sit down and start checking these
            things.

LILLY:      Yeah. Let them know Nigel won't fuck with
            them plain and simple.

WONG:       Alright, man.

67.  In the above conversation, I believe that LILLY was not only discussing money, but counting it while he had WONG on the telephone.   It also appears that WONG acknowledged that he was not properly checking the drug proceeds which he had collected on LILLY's behalf ("I got to start checking these things"). LILLY responded by telling WONG to let people on the street know that he "won't fuck with them."

J.    MICHAEL BROWNE Supplies Cocaine
      And Launders Money for LILLY

68.  During the course of monitoring the LILLY PHONES, ICE agents have identified BROWNE as a both a narcotics supplier and money launderer for the organization.  In various telephone calls intercepted over the LILLY PHONES, ICE has intercepted conversations between BROWNE and LILLY which demonstrate BROWNE's role in the organization.

69.  On February 9, 2005, at about 10:58 a.m., LILLY

used the LILLY PHONE-2 to call BROWNE.   During that call, LILLY
said he "got a lot of missed calls" and would call back people to
see what was going on. BROWNE told LILLY that he just got a call
from "them" asking him BROWNE how much he got.   BROWNE said he
did not want to tell "them" he had "ten."   BROWNE further
emphasized to LILLY that he would like to have a little "50" or
"60" today to give "them."   LILLY acknowledged what BROWNE had
told him and ended the conversation.

70.   Based on my training, experience and the
investigation to date, I believe that LILLY and BROWNE were
discussing drug proceeds.   "Them" is believed to be a reference
to Guyanese suppliers, while "10," "50" and "60" are references
to money amounts.   Thus, it appears that BROWNE and LILLY's
Guyanese suppliers were calling BROWNE seeking money.   BROWNE
apparently did not tell them he had $10,000, but he wanted to
have more, perhaps $50,000 or $60,000 to pay the suppliers.

71.   The following day, February 10, 2005, at
approximately 7:00 p.m., LILLY received a call on LILLY PHONE-2
from BROWNE:

> BROWNE:   Hello.
>
> LILLY:   Ummm.
>
> BROWNE:   Hello, where you see I call you, that's is
> because they are on my case again.  So we
> got...., I tell you that I will receive X
> amount, so I tell you by the end of the night
> I should be ready for he.
>
> LILLY:   Okay, so somebody just call me, so you should

be definitely.

BROWNE:   Alright.

72.  Based on my training, experience and the investigation to date, I believe that the above referenced conversation refered to problems with BROWNE and LILLY's suppliers ("they are on my case again").  Furthermore, BROWNE appears to have told the suppliers that once he received some cash, he would call the Guyanese suppliers and let them know that he had money to pay them ("I tell you that I will receive X amount, so I tell you by the end of the night I should be ready for he").

73.  My understanding of the above-described call is confirmed by the following call from BROWNE to LILLY at approximately 11:47 p.m. that same evening:

LILLY:   Yes, brother Mike.

BROWNE:   Yeah, what I call to tell you too, you know, if anybody call you, don't even answer your phone.  You know who what I am talking about.

LILLY:   Okay.

I believe that BROWNE was calling LILLY to tell him to avoid answering the phone in case one of the suppliers to whom they owed money should call LILLY.

74.  This problem continued, as evidenced by another intercepted call from BROWNE to LILLY the following day, February 10, 2005, at approximately 9:32 a.m.:

```
BROWNE:   Hello?

LILLY:    Hmm.

BROWNE:   Hmm.  What's up?

LILLY:    I just woke up.  So I'm going to make some
          calls and get back to you.

BROWNE:   Oh rass, [expletive] boy, we ain't got much
          time.

LILLY:    I know.

BROWNE:   'Cause... 'cause, I told the man I got
          twenty-five in hand right now, so the man
          sending somebody to get it.

LILLY:    Right.  Let me make two calls, right?
```

75.  Based on my training, experience and the investigation to date, I believe that LILLY and BROWNE are discussing a drug debt.  Apparently, BROWNE told the suppliers that he had $25,000 available ("twenty-five in hand right now") and the suppliers were seeking to collect it.

76.  On February 28, 2005, at approximately 1:59 p.m., LILLY used LILLY PHONE-2 to call BROWNE.  During that conversation, LILLY told BROWNE that you must tell "them" that the "last food definitely bad because a next man called me and tell me the same thing."  LILLY and BROWNE continued to talk about how this was a continuing problem because the issue came up recently.

77.  Based upon my training, experience and the investigation to date, I believe that LILLY and BROWNE were

discussing a recent shipment of cocaine ("food") which was of poor quality and about which they were receiving complaints ("the next man call me and tell me the same thing").

78. My interpretation of this call is supported by a call LILLY recieved on TARGET PHONE-2 on March 1, 2005 at approximately 10:04 a.m. from WONG, who was calling from (646) 436-2368. During that conversation, WONG told LILLY about the ongoing problem because the stuff was bad and WONG said he could take the "thing" and "give the man back his money", because WONG has people calling for "the hard".

79. Based upon my training, experience and understanding of the code used by these narcotics traffickers, I believe that WONG and LILLY were discussing poor quality drugs that would have to be taken back from customers ("give the man back his money"). A solution was to sell crack instead("the hard").

K.    DERRICK WALTERS Communicates with the
      Narcotics Sources for LILLY

80. On January 17, 2005, at 11:06 p.m., LILLY received an incoming call on LILLY PHONE-1 from (718) 848-6656, used by DERRICK WALTERS, also known as "Patrick Obermuller." During this call, which was intercepted over the SUBJECT TELEPHONE, WALTERS said that these "people" called from "G-T" for the past two or three days, and that "they call about a hundred times." WALTERS further stated that "that you were responsible for that."

WALTERS stated that he told the "people" that "Let me tell you all the facts.  The way this. . . how it is.  Anyway, I guess they know who Clay is and everything and they said, well they talk to those people down there." Further in the conversation, LILLY asked, "Oh, how can I be responsible, I am the one that sent twenty something thousand dollars."  LILLY later asked WALTERS about "The one who works in clearance."  WALTERS apparently did not understand what LILLY was talking about, so LILLY restated "The people who work in clearance is clearing Ricardo."  WALTERS replied that "Yes, yes, they know everything man.  Remember it is just a small circle, they know everything." LILLY responded, "Exactly."  WALTERS continued, "They know everything.  It's not papers where they could hide.  They know everything."

81.  Based upon my training and experience, and my knowledge of other ICE investigations relating to cocaine smuggling from Guyana, it is my opinion that this conversation concerned narcotics smuggling from Guyana. "G-T" is a common shorthand for Georgetown, Guyana.  It appears that LILLY and WALTERS are discussing problems with narcotics suppliers in Guyana ("they call about a hundred times").  Furthermore, it appears that these problems were resolved because of a conversation or relationship with "Clay."   It is believed that "Clay" is a reference to Clay Hutson.  Based upon information provided by confidential sources, ICE believes Hutson to be one

41

of the most significant drug distributors in Guyana.  Thus, it appears that WALTERS acted as an intermediary between LILLY and the Guyanese source.  The call also included a conversation about a lost or seized shipment of drugs in Guyana, who was responsible for the seizure, and the fact that LILLY lost $20,000 as a result of that seizure.  The conversation then lapsed into a discussion of other drug dealers who were able to get their narcotics through the Georgetown airport undisturbed (the "clearance").

        82.  ICE is aware from confidential sources in related investigations involving Guyanese narcotics traffickers that many airport employees and security officers in Georgetown, Guyana receive payment from narcotics smugglers in exchange for permitting cocaine to leave the country.  In particular, this conversation mentions "Ricardo."  It is believed that LILLY may be referring to RICARDO RODRIGUES, who is known to ICE, through reliable confidential sources, to be another significant Guyanese cocaine distributor.

        L.   MOSES LNU Is an Intermediary with Guyanese Sources

        83.  Our investigation has also indicated that "MOSES" is an intermediary between LILLY and various sources in Guyana, including HUBERT CLARKE.  For example, on January 18, 2005 at approximately 12:02 p.m., LILLY received a call on LILLY PHONE-1 from MOSES, who was calling from (347) 203-4869.  During that call, MOSES asked LILLY if "them people called you from GT." LILLY asked who MOSES was referring to, and MOSES replied that he

42

"Don Delaware."  LILLY stated that Don Delaware had not, but that "Pat Man" had called.  MOSES stated that he was "pissed" at Pat Man.  Further in the conversation, LILLY stated that "what happened when it was frozen, when the things came out it spoiled, they just disregard it."  LILLY continued, stating that "What happened was Shelly and them and him collect what they have to collect. . .but they never paid the obligation."

84.   Based upon my training, experience and the investigation to date, I believe that this conversation concerned narcotics sources in Guyana.  I know that "GT" is slang in the Guyanese community for Georgetown, Guyana.  I believe that the conversation started to discuss sources, such as "Don Delaware" and "Pat Man."  LILLY also mentioned shipments of cocaine hidden in frozen fish ("it was frozen") and that sometimes the shipments went bad ("it came out spoiled, they just disregard it.")  They then discussed "Shelly," who I believe is MCQUNE, and how she and CLARKE collect money from LILLY but never pay the ultimate cocaine source ("them and him collect. . . but they never paid the obligation").

85.   On January 25, 2005, at approximately 11:48 a.m., LILLY received a call from WALTERS on LILLY PHONE-1.  Almost immediately, WALTERS put MOSES on the line for a three-way call. LILLY, WALTERS and MOSES to discuss "Shelly" (MCQUNE) and an apparent dispute with MCQUNE and "Dun-Dun" (CLARKE).  Apparently, LILLY had called MCQUNE, but she refused to put CLARKE on the

43

telephone ("from time Shelly answer the phone... all she got to do is pass the phone to him and he got to be a man and get on the line"). Apparently, LILLY believed that CLARKE needed to collect some money, but refused to deal with the issue ("absolutely nothing to deal with it . . because he's the one. . .that collect it. . .it's his possession").  MOSES attempted to resolve this dispute by putting LILLY on the line with CLARKE ("cause the only reason why I tell when them. . .I said man it ain't make no sense..y'all get together with him and call me back.)" LILLY complained that he tried that, but no one called him back.   The call later concluded, with no resolution to the dispute.

      M.   LILLY Discusses
          Narcotics Transactions with DERRICK BARTON

    86.  On January 15, 2005, at approximately 5:27 p.m. LILLY made a call LILLY PHONE-1 to (516) 574-3557, which is subscribed to DERRICK BARTON ("BARTON").  During the conversation, LILLY asked BARTON if he had gone to "the club on Ralph?"  BARTON did not appear to understand what LILLY was asking about, so LILLY elaborated, "The place where you took my youth, the one I gave you the something to take to the club?  The Buggy Lounge."

    87.  At this point, BARTON claimed that he could not hear LILLY, told him he would call back, and ended the call. A follow up call from BARTON to LILLY on LILLY PHONE-1 was intercepted 10 minutes later.  During this call, BARTON referred

44

to LILLY as "Boss," and apologized for not completing the previous call.  LILLY then told BARTON that he was trying to find out if BARTON had "gone to the club we had spoken about."  BARTON confirmed that he had not gone to the club.  LILLY then stated that he wanted to go to the club that night.  LILLY and BARTON agreed to speak later.

88.  Later that evening, at about 9:21 p.m., LILLY made an outgoing call on LILLY PHONE-1 to BARTON at (516) 574-3577. During this call, BARTON stated that he was not going to make to the meeting with LILLY.  BARTON asked LILLY if the "Chinese thing" was ready, to which LILLY answered "Yeah, yeah, yeah, yeah."  BARTON tried to confirm this asking "Are you positive?" LILLY then told him they would meet and talk about it.

89.  Based upon my training and experience in the use of code by narcotics traffickers, it is believed that BARTON and LILLY were discussing a narcotics or money transaction (the "thing" or the "Chinese thing") during this conversation.  It also appears that BARTON may work for LILLY (the "boss") and that they were discussing a meeting or delivery at a certain location (the "club").

N.    LILLY Arranges a Drug Deal with CHUBBY

90.  On February 7, 2005, at about 11:20 p.m., LILLY received an incoming call from (570) 328-2377.  The subscription information has not yet been obtained, but the caller, a male, identified himself as "CHUBBY.  During the call, CHUBBY said that

"Somebody wants to talk to you about some white."  CHUBBY then put an unidentified male ("UM-1") on the telephone.  UM-1 then asked LILLY how much he (LILLY) charges for 62 "of that."  LILLY told UM-1 that he charged "14-50."   UM-1 asked if "it was good," to which LILLY replied, "its good."  UM-1 asked if he could get it tonight.  LILLY replied that he could get it to him at 8:00 the following morning at the earliest.  The call then ended.

91.  Based upon my training, experience and knowledge of codes used by narcotics traffickers, I believe that "white," "62" and "14-50" were references to cocaine, drug quantities and a purchase price. Agents who are familiar with codes for crack cocaine have informed me that "62" is a common code for 2 ½ ounces of crack cocaine.  Thus, I believe that LILLY, CHUBBY and UM-1 were arranging a cocaine base sale.

O.    LILLY Negotiates Narcotics Deals with RAWLE HOYTE

92.  Our investigation has determined that RAWLE HOYTE ("HOYTE") is a customer of LILLY's, and negotiated the purchase of heroin from LILLY.  For example, on February 13, 2005, at approximately 1:02 p.m., LILLY called HOYTE at (212) 690-1416. During that conversation, LILLY asked HOYTE to find out if he can deal with "three" today. HOYTE said maybe he could.  LILLY told HOYTE that he should call him back and let him know. LILLY asked HOYTE if it was "cash and carry."  HOYTE confirmed that it was "cash and carry."

93.  Based upon my training, experience and the

investigation to date, I believe that HOYTE and LILLY were
discussing a narcotics transaction.  I believe that "three" is a
quantity of narcotics, perhaps three ounces, and that HOYTE
wanted to know whether he had to pay for the cocaine up front
("cash and carry") or whether he could get it on credit.

94.  My interpretation of this call is bolstered by a
call received by LILLY on LILLY PHONE-2 the following day,
February 14, 2005, at approximately 1:15 p.m.:

> HOYTE:     Listen,  I got some things working on
>            right now even for tonight
>            you know what I mean..? The only reason
>            if..if any thing don't go down
>            tonight, it would only be because of the
>            Valentine, if I got to take my
>            wife out but everything is in place for
>            tonight. Now what I got to ask you
>            is this remember, the other thing you
>            asked me about?
>
> LILLY:     Yeah.
>
> HOYTE:     I got somebody right now thats heavy,
>            but I need a number from you.
>            Give me a small number on a "O".
>
> LILLY:     Yeah but I got nothing right now star, I
>            want to know if he have
>            clientele I could bring in.
>
> HOYTE      Yeah, I got...I got...thats what...umm..
>            I just got of the phone with my
>            dog, I...they...all they need to know is
>            a number. I just need a
>            number, tell me a number, tell me a
>            number you...for that on the "O"
>            and I could figure out the rest.
>
> LILLY:     Okay...okay...okay.
>
> HOYTE:     On the "Onions" for that you know what I
>            am talking about. The other

thing.

LILLY:    Yeah...yeah...yeah. Alright it was
          about...about sixty (60) for a "G".
          A gram.

HOYTE:    How much?

LILLY:    About fifty five (55) sixty (60) for a
          gram.

HOYTE:    How much five (5) fifty (50)?

LILLY:    Fifty five (55) to sixty (60) for a
          gram.

HOYTE:    Fifty five (55) to sixty (60). Alright.

LILLY:    Yeah.

HOYTE:    Whats your number? What do you want to
          go with?

LILLY:    Oh, I would probably go with that fifty
          five (55).

95.    Based upon my training, experience and the
investigation to date, I believe that LILLY and HOYTE were
continuing their negotations from the day before.  Apparently,
HOYTE was negotiating on behalf of a customer (his "dog") for the
price of heroin.  At first, HOYTE tried to talk in code,
continuing the previously cited conversation about ounce
quantities of heroin ("onions").  However, LILLY disregarded the
code and clearly discusses quantities ("grams") and prices ("55
to 60").  I know from my training, experience and conversations
with other agents that these prices correspond to heroin prices
in New York.

48

P.   JERMAINE NICHOLSON Is a LILLY Customer

96.  Our investigation has also revealed that JERMAINE
NICHOLSON ("NICHOLSON") is also a cocaine distributor and
customer of LILLY's.  On February 21, 2005, at approximately 1:04
p.m., LILLY received a call on LILLY PHONE-1 from NICHOLSON, who
was calling from (917) 291-4051, which is subscribed in his name.
During that call, Nicholson told LILLY that the "man" said he
wanted a sample of the "thing" to show "the big man".  LILLY told
him "ok."  NICHOLSON asked if LILLY could bring it so he could
take it to the "man" tomorrow,  and LILLY said yes.

97.  Based on my training, experience and the
investigation to date, I believe that NICHOLSON was asking LILLY
for a "sample" of cocaine to give to his boss ("the big man").
My understanding of this conversation was confirmed by a call
three days later, on February 24, 2005 at approximately 2:22
p.m., where LILLY called NICHOLSON.  During that call, NICHOLSON
informed LILLY that "the man" loved "the sample."  LILLY told
NICHOLSON that a man from Virginia also said he loved it.

Q.   ROCHELLE MARCUS Is a
     Bookkeeper for the Organization

98.  Our investigation also indicates that ROCHELLE
MARCUS is a paramour of BROWNE, who acts as a money-launderer and
bookkeeper for the organization.

99.  On February 8, 2005, at approximately 3:01 p.m., a
call was received by LILLY on LILLY PHONE-1 from (917) 561-3681,

which is subscribed to by MARCUS:

       MARCUS:   Can you speak?

       [Voices overlap]

       LILLY:    Yeah.

       MARCUS:   Okay.  What is the ...ahm...?  The balance you got to bring in for them?  'Caw the people them round with him, tell me the person [Inaudible], and them want send somebody... [Phone breaking up]

       LILLY:    [Uninteligible] got headache with it.

       MARCUS:   Umm?

       LILLY:    I am waiting on people, if they want to ask me to buy it from them.  I ain't (don't) have no headache with it.  I can't fight it.

       MARCUS:   Okay.  [Pause]   I am going to call you, and tell you.

       LILLY:    Ahn?

       MARCUS:   I say I am going to call you, and tell you.

       LILLY:    Alright.

       MARCUS:   Bye.

    100. Based upon my training, experience and the investigation to date, I believe that MARCUS and LILLY were discussing money that LILLY owed to suppliers that MARCUS was supposed to deliver ("the balance you got to bring with them"). LILLY replied by stating that he had a problem producing the money ("got a headache with it").  MARCUS indicated that she

would call back and discuss the issue with LILLY further.  I further believe that "him" refers to BROWNE.

   101. On February 19, 2005, at approximately 5:09 p.m., LILLY and MARCUS had a conversation over LILLY PHONE-1:

| | |
|---|---|
| LILLY: | Those people call me back. |
| MARCUS: | Ah( What?) |
| LILLY: | You remember I told you that I cut some people off. |
| MARCUS: | Yeah..and what happen? |
| LILLY: | We had a long talk... |
| MARCUS: | Ah? (What?) |
| LILLY: | We had a long discussion. |
| MARCUS: | Ah (yes)..the people and you who you cuss out. |
| LILLY: | Yeah. |
| MARCUS: | Ok. |
| LILLY: | I will try something with them again I see what happen? |
| MARCUS: | Ah? |
| LILLY: | I am going to try something again and see what happens. |
| MARCUS: | Ok, Ok, Ok...oh so that is what happen..yeah you did tell me somebody tried to make you a fool and you had to put them in check. |
| LILLY: | He was with me when I was talking to them. |
| MARCUS: | Ah huh. |
| LILLY: | [Noise in the background]..to tell his people. |

MARCUS:     Eh huh(yes)..well they called him up to this
            morning I don't know what they told him...and
            I don't know what he told them..background
            noise...yeah..

LILLY:      Yeah it is really dead but it just a little
            bit left back to do.

MARCUS:     Huh?

LILLY:      I said it is really dead but however...

MARCUS:     Eh huh.

LILLY:      There is a little left back from the first
            set.

MARCUS:     If what...

LILLY:      I said is only a little bit left back from
            the first set...

MARCUS:     Ok, ok, ok.

102. During this part of the conversation, I believe,
based upon my training experience and the investigation to date,
that LILLY and MARCUS were discussing problems that LILLY and
BROWNE were having with their narcotics suppliers ("I cut some
people off . . "he was with me when I was talking to them").
LILLY discussed how the drug business was slow ("it is really
dead") but he still had cocaine to sell ("there is a little back
from the first set").   The conversation continued:

LILLY:      Eh huh (yes)..he was telling how much they
            gave them..and they were telling him no..so
            he had to calculate for them...

MARCUS:     Ah..( What)

LILLY:      He said he was telling them how much he gave
            them..and they were saying no so her had to

52

calculate for them.

MARCUS:     How do you mean...how much they gave them..in
            what way?

LILLY:      How much they received so far?

MARCUS:     Ok, ok..ok..I got paper
            here..[unintelligible] huh...

LILLY:      I thought you had one.

MARCUS:     If what...

LILLY:      I thought you said you didn't know.

MARCUS:     I had a paper for what he sent home to
            them..I made a note of it..because Albert
            always have questions back and forth..back
            and forth so I made a note of it...so I have
            a paper for him..so I know how much he gave
            them so far.

LILLY:      Eh huh (yes).

MARCUS:     And how much he is suppose to get back from
            you?

LILLY:      Eh huh (yes)..that's what I asked you the
            other and you said you didn't know.

MARCUS:     What? I thought you asked me about the new
            one...

LILLY:      How I am going to ask you about the new
            one...

MARCUS:     Oh...I don't know nothing about that..I don't
            know nothing about no new one..cause I have
            everything written down..the first set you
            bring was fifteen..was...ah hello

LILLY:      Yeah, I am listening.

MARCUS:     Hello...yeah that was the first set you bring
            was 1-5..I got it write down..yeah..because
            truthfully..they still got...the last set you
            gave...I mean the last set you  bring the
            other day was 1-5..1-5  you bring, we still

53

> have one more..one more..because he said
> twenty..twenty one something or twenty two
> something..either twenty one- something more
> to come in from the first set...

103. Based upon my training, experience and the investigation to date, I believe that LILLY and MARCUS further discussed funds that were being sent to narcotics suppliers in Guyana ("how much they received so far"). MARCUS then interjected by saying she was keeping records (the "paper") of monies that were being sent to Guyana ("I had a paper for what he sent home to them...I made a note of it... so I know how much he gave them so far"). The conversation then continued, with MARCUS discussing how she noted how much was sent $15,000 ("15") for the last shipment ("set") of cocaine received from Guyana.

R.     GARFIELD LNU Is a LILLY Customer

104.   Our investigation has also identified GARFIELD, a narcotics customer of LILLY. On February 25, 2005, at approximately 11:25 a.m., LILLY received a call from GARFIELD, who was calling from (917) 214-2816. During that conversation, GARFIELD asked if a "six deuce" was "15-5," to which LILLY responded "that is correct."

105.   Based upon my training, experience and the investigation to date, I know that "six deuce" is street slang for 2 1/2 ounces of crack cocaine. I believe that "15-5" was a reference for LILLY's proposed selling price $1,500. Thus, I believe that this conversation was an inquiry by GARFIELD

54

concerning the sale price of cocaine base.

106.   On March 6, 2005, LILLY used LILLY PHONE-2 to call GARFIELD.  During that conversation LILLY asked GARFIELD if "Piggy, his people are snorters, right?"  GARFIELD responded "yeah" but added that sometimes "they fry their shit, too." GARFIELD and LILLY continued the conversation, talking about using "baking soda" and how the "baking powder makes it swell."

107. ˙ Based upon my training, experience and the investigation to date, I believe that this conversation was about one of GARFIELD's customers ("Piggy") and whether they snorted cocaine or cooked into crack form ("fry their fish").   I also know from my training and experience that baking soda is used to turn powder cocaine into crack cocaine.

S.     CHRISTOPHER WEST Is a LILLY Customer

108.   Our investigation also reveals that CHRISTOPHER WEST, also known as "Tony," is LILLY's roomate and a customer of LILLY's narcotics operation.  For example, on December 18, 2004, at approximately 9:43 p.m., WEST left a message on LILLY PHONE-1 asking about the cost of a "battery" for the "remote control car."  WEST reiterated this statement by saying "you know what I'm saying."  WEST stated that he did not know if the battery was "nineteen dollars" or "twenty-one dollars."

109.   Based upon my training, experience and the investigation to date, I believe that WEST was asking for the price of a kilogram of cocaine ("battery").  I know that the

55

street price for a kilogram of cocaine in New York at the present time is approximately $21,000 ("twenty-one dollars") or $22,000. WEST was exploring the possible price with LILLY.

110.  The following day, at about 9:21 p.m., LILLY called WEST using LILLY PHONE-1 and told him that the battery was "twenty-two dollars."

111.  Based upon my training, experience and knowledge of the investigation to date, I believe that the "remote control car battery" is, in fact, a reference to a kilogram of cocaine. I believe that WEST was seeking to purchase a kilogram of cocaine from LILLY for $19,000 or $21,000.  However, LILLY replied by stating that the price was $22,000 per kilogram.

112.  Additionally, on March 31, 2005 at approximately 7:43 p.m., LILLY received a telephone call from WEST.  During that call, WEST asked LILLY to "put me to your cousin."  LILLY replied, "Put you to her?"   WEST stated, "Yeah, where you, where you sent me for the, for the uh, something by the, by the clothes."  LILLY then directed WEST that it was "right there in the laundry bag."  WEST replied, "Alright."  Shortly thereafter, WEST told LILLY that he was going to "put the something, I'm going to put something on it, right?"  LILLY replied, "Alright, then zero it."  LILLY and WEST then discussed how much WEST was trying to "get out."  WEST stated that he was trying to get out "one-eight."  LILLY asked, "Oh, an eight, an eight-ball?"  WEST replied, "Yeah."  LILLY then advised WEST that a "One-eight ball

is 3.5 . . .3.5 grams." LILLY further advised WEST that the "number" was "about a hundred dollars."

113. Based upon my training, experience and the investigation to date, I believe that LILLY and WEST were discussing narcotics in this conversation. Furthermore, it appears that WEST was calling LILLY from the SUBJECT PREMISES, as WEST was asking LILLY the location of the cocaine ("your cousin"), which LILLY had hidden. LILLY directed WEST to the appropriate stash location ("in the laundry bag"). As the conversation proceeded, WEST was weighing out cocaine for sale on a scale belonging to LILLY ("put something on it" and "zero it"). WEST then weighed out an "eight-ball" which is a well-known slang for 1/8 of an ounce, or approximately 3.5 grams of cocaine. LILLY then advised WEST that the cocaine should then sell for one-hundred dollars.

### T.   MICHAEL REID Purchases Drugs from LILLY

114. The investigation has revealed that MICHAEL REID ("REID") is a narcotics distributor for the organization. For example, on February 19, 2005, at approximately 5:39 p.m., LILLY received a call from REID on LILLY PHONE-2. During that call, REID stated that nothing had changed, and "everything still the same," but that he was at work and that he would give a call at 8 or 9 o'clock. LILLY then asked REID what number he wanted, and REID stated that he wanted "125."

115. Based upon my training, experience and the

investigation to date, I believe that LILLY was arranging to sell 125 grams of cocaine ("125") to REID.  Apparently, LILLY and REID had previously arranged the deal, but were attempting to finalize it.  In calls intercepted over TARGET PHONE-2 the following day, February 20, 2005, it appears that LILLY and REID met in person.

116. Additionally, calls over LILLY PHONE-2 indicate that LILLY and REID conduct narcotics transactions. On March 6, 2005, at about 4:57 p.m., LILLY called REID using LILLY PHONE-2. During that call, LILLY told REID that the only "thing" that he has is good for "snorting."  REID told LILLY that it was fine because that is all his people deal with.  LILLY said that it was "all one-purpose anyway," to which REID said it was fine, because sometimes they "put it in the kitchen." Based upon my training, experience and the investigation to date, I believe that REID and LILLY discussed  cocaine ("thing") and whether it could be sniffed ("snorting") or cooked into cocaine ("put it in the kitchen").

117. On March 7, 2005, at approximately 9:09 a.m., LILLY received a call from REID.  During that call, REID stated that one of "his boys" didn't come in to "work" today.  REID told LILLY that he would have to take it down to "62."  REID and LILLY agreed to meet later.  Based upon my training, experience and the investigation to date, I believe that REID and LILLY were arranging a sale of crack.  It appears that one of REID's street sellers ("boys") was not working, so therefore, REID was going to

going to have to reduce his purchase of cocaine to "62," which I know from my training and experience is street slang for 2 1/2 ounces of crack cocaine.

118.    In a call later that day, made by LILLY on LILLY PHONE-2 to REID, they arranged for LILLY's cousin to make the exchange by the Brooklyn Marriott.  At 12:17 p.m. that day, REID called to indicate he was at the location, but he expressed concern because the "popo," code for police, were all around the location.  LILLY reassured REID, and told him to just jump in his cousin's car when she arrived.

    U.    TIMOTHY MCKENZIE Is a LILLY Distributor

119. On February 9, 2005 at approximately 4:43 p.m., LILLY received a call on LILLY PHONE-2 from (323) 309-0712, which is subscribed to by TIMOTHY MCKENZIE, also known as "Spliff." Toward the end of the conversation, MCKENZIE began to discuss "Rupaul" (KENT BRYAN).  MCKENZIE complained that BRYAN owed him money.  LILLY then asked MCKENZIE if he could bring over the "measurement," asking MCKENZIE if he had a "new" one.  MCKENZIE agreed.   Based upon my training, experience and the investigation to date, I believe that LILLY was asking MCKENZIE to bring over a scale.  As detailed below, given the additional conversation discussing drug quantities, I further believe that the scale was to be used for weighing drugs.

120.    On February 11, 2005, at approximately 10:45 a.m., MCKENZIE called LILLY on LILLY PHONE-2 and had the

following conversation:

LILLY:      I just fell asleep.

MCKENZIE:   How much?  How much in it?

LILLY:      Huh?

MCKENZIE:   An eight is how much?

LILLY:      Oh!  Twenty eight [28]

MCKENZIE:   Twenty eight [28] ahm... little... little
            one?

[Pause]

MCKENZIE:   Hello?

LILLY:      Yes.

MCKENZIE:   "G" ones, right?

LILLY:      Can't hear you.

MCKENZIE:   Twenty eight [28] "G" ones, right?

LILLY:      Right.

MCKENZIE:   Alright then. alright.

[Voices Overlap]

MCKENZIE:   Twenty eight [28]?   Then...  then...
            then...  that...  that isn't one [1] zag man?

LILLY:      Oh, it is one zag?  Oh!  Oh!  Oh!  Oh!
            Seven-fifty [7-50]

MCKENZIE:   No, not...  no, not one zag I'm talking
            [about].  I said how much in...  is an eight?
            How much is it?

LILLY:      Four [4] and...   Four and a half [4 1/2],
            something like that. Big H.

MCKENZIE:   Four and a half [4 1/2] what?  Zag [ph]?

LILLY:      Yeah.

MCKENZIE:   Okay, okay.

LILLY:      Alright?

MCKENZIE:   Okay.  Four and a half  [4 1/2] zag [ph]?

LILLY:      Yeah.

MCKENZIE:   You're sure, right?

LILLY:      I'm sure man.

MCKENZIE:   Alright then.

121.   My training, experience and understanding of the investigation date indicates that in the portion of the conversation detailed above, LILLY and MCKENZIE were discussing drug quantities and prices.  At first, MCKENZIE asked LILLY how much was in an "eight" which I believe to be abbreviated slang for "eightball," a street quantity of cocaine.  LILLY responds "twenty-eight" or 28 grams.  Further in the conversation, MCKENZIE asks about a "zag," which is slang for an ounce of cocaine. LILLY tells MCKENZIE that a zag is "750" or seven-hundred and fifty dollars, which I know to be the current street price for this quantity of drugs.  Finally, MCKENZIE asks how much is in an "eight," to which LILLY replies "four and a half zag."  I believe that they were discussing what is known on the street as a "big eight" or 4 1/2 ounces of cocaine.  Based on the above telephone calls, I believe that MCKENZIE is a narcotics distributor who purchases cocaine from LILLY.

V.     FREDDY LNU Is a Customer of LILLY

122.   The investigation has identified "FREDDY" as a customer of LILLY.  On February 13, 2005, at approximately 5:00 p.m. LILLY called FREDDY using LILLY PHONE-2.  During that call, FREDDY stated, "I had to stall you a little" because "I didn't have any more thing to like work with."  FREDDY further stated that he had to give someone a "little thing" to "blend it out," and that was why he was stalling.  FREDDY informed LILLY that he was going to see a "man" and "pick up that from him, ...and try [to] make it up.  FREDDY asked LILLY to "bear with me a little." LILLY agreed.

123.   Based upon my training, experience and the investigation to date, I believe that FREDDY was discussing payment that he owed to LILLY for narcotics, but was explaining why he was delayed in making payment ("stall you a little").  One reason provided by FREDDY for the late payment was that he had no good cocaine to sell ("no more thing to work with") and that he needed some more cocaine to mix up with what he already had ("blend it out").  FREDDY was going to try and pick up some more cocaine (see a "man" to "pick that up") and sell it to get LILLY some money ("try [to] make it up").  LILLY agreed to "bear with" FREDDY.

124.   A second call from FREDDY confirmed his relationship with LILLY.  On March 12, 2005, at about 9:39 a.m., LILLY called FREDDY using LILLY PHONE-2.  During that call, LILLY asked FREDDY why he had not received a call in a while.  FREDDY

62

again said that "it took time" and that it "took about a month" because he had to "blend" it.  Further in the conversation, LILLY told FREDDY that "I have somethings, but it, it, it's not good for the kitchen. . .  it's just good for snorting, you know." LILLY further stated, "I was telling you say (that) I have it, but that's good for snorting.  But today I'm getting all purpose."

125.  Based upon my training, experience and the investigation to date, I believe that this conversation between FREDDY and LILLY concerned narcotics transactions.  The conversation began with FREDDY explaining to LILLY why he had not called and done business with LILLY in almost a month, stating that "it took time" for FREDDY to "blend" and sell the drugs he already had.  LILLY then began to tell FREDDY about the cocaine that he already had stating it was not good for making crack cocaine ("not good for the kitchen"), but that it was good for "snorting."  LILLY informed that he was getting a new shipment of cocaine that was good for snorting or making into crack cocaine ("today I'm getting all purpose").  Thus, I believe that FREDDY is a cocaine customer of LILLY.

126.  On March 31, 2004, at about 2:34 p.m.,  FREDDY called LILLY on LILLY PHONE-2.  During that call, FREDDY stated that he was "getting bad reports from all angles."  FREDDY told LILLY that "it" was not "chaffed" good and that it doesn't take a certain form good and that if he forces it, "it" has a tendency

63

to have a different color when it melts.   FREDDY later boasts that he is a "wholesaler," right in the Brooklyn so he knows all the "tricks of the trade."   FREDDY also mentioned that it is a competitive market.   FREDDY and LILLY then discussed that he had to get something "different" and maybe he can "blend" it in to make it into a different color and appearance.

127.   Based upon my training, experience and the investigation to date I believe that the above conversation concerned complaints that FREDDY received from his cocaine customers ("getting bad reports from all angles").   FREDDY told LILLY that the cocaine was not dried out properly ("chaffed" good) and therefore it was not taking a proper form when it is heated ("melted").   FREDDY boasted to LILLY about his experience with drugs ("wholesaler" who knows the "tricks of the trade"). FREDDY and LILLY finally tried to remedy situation, brainstorming about how they can "blend" the poor quality cocaine to disguise its color and appearance.

W.   FNU LNU Is a LILLY Customer

128.   During the course of the investigation, FNU LNU, a unknown male who uses a phone subscribed to "Winsome Housen" has been identified as a customer of LILLY's organization. On February 13, 2005, at approximately 2:28 p.m., LILLY used LILLY PHONE-2 to call FNU LNU.   During the conversation, FNU LNU stated that his "boys" wanted to know "what time is it."   LILLY responded by stating that he would "line him up" today.   Based

64

upon my training experience and the investigation to date, I
believe that FNU LNU was asking for narcotics on behalf of his
customers ("boys" needed to know "what time is it").   LILLY told
FNU LNU that he would "line him up," or provide narcotics that
day.

129.   On February 28, 2005, at approximately 1:56 p.m.,
LILLY used LILLY PHONE-2 to call FNU LNU.   During that
conversation, FNU LNU told LILLY that he was "stressed" because
things were slow.   LILLY and FNU LNU then discussed how some "bad
food" had come in.   FNU LNU also stated that how he told "them"
that is should not happen again.   FNU LNU complained to LILLY how
he had lost money.   Based upon my training, experience and the
investigation to date, I believe that this conversation concerned
narcotics.   In complaining that things were "slow," FNU LNU was
complaining about his narcotics sales business.   When discussing
"bad food," FNU LNU and LILLY were discussing poor quality
narcotics, and how FNU LNU told the suppliers who gave him these
narcotics ("them"), that it should not happen again.

130. The investigation also proved that LASSITER,
discussed above, is linked to FNU LNU.   On March 12, 2005 at
approximately 5:23 p.m., LILLY received a call on LILLY PHONE-2
from LASSITER.   During that conversation, LASSITER told LILLY
that he had some "box" for him.   LILLY asked LASSITER, "What
kind?"   LASSITER replied, "Ruger, Ruger, Ruger."   LASSITER
further stated that he was going to "keep one of them and bring

you one."  During this investigation, LASSITER has traveled to New York solely for the purpose of trading guns, purchased in Virginia, for drugs, which he would bring back to Virginia for sale.  LASSITER stated that he would be in New York on Monday. Just two minutes later, LILLY used LILLY PHONE-2 to call FNU LNU. LILLY told FNU LNU that the "boy from VA" would arrive on Monday. LILLY told FNU LNU that they would discuss it further later.

131. Based upon my training, experience and knowledge of this case, I believe that LASSITER was coming to New York to provide LILLY with at least one additional gun, a Ruger, which is a well-known manufacturer of handguns.  The immediate call by LILLY to FNU LNU notifying him of the impending visit by LASSITER (the "boy from VA") is also significant.  Narcotics dealers are fiercely protective of their customers' identities and the business that they conduct with their customers.  The fact that LILLY was notifying FNU LNU of LASSITER's visit indicates that FNU LNU had an interest in the impending transaction or was going to be introduced to LASSITER for some other illicit business purpose.

X.    FNU LNU-2 Is a LILLY Customer

132.  FNU LNU-2, also known as "Joel Hernandez," as been identified as another customer of the LILLY organization.  During a call intercepted over LILLY PHONE-2 on February 12, 2005 at approximately 2:00 p.m., FNU LNU-2 stated that LILLY was "doing him a favor" so he could not "cry."  FNU LNU-2 further stated

that when he was working with LILLY's program he thought "he was in heaven" with the "first thing." Later in the conversation, FNU LNU-2 discussed how he had to put a "thing. . . put a chicken in the oven and bake it down." However, FNU LNU-2 stated that the chicken had too much "oil" and that he had to wait for hours for the "oil to dry out of the chicken." Later in the conversation, LILLY told FNU LNU-2 that he had some "powerhouse" coming in. FNU LNU-2 replied that if he could get that "out of that chicken farm, it got to be good. The first food . . that chicken farm is good."

133. Based upon my training, experience and the investigation to date, I believe that LILLY and FNU LNU-2 were discussing narcotics transactions. The references to "doing a favor" and how FNU LNU-2 could not "cry" were references to previous drug sales and how FNU LNU-2 could not complain about the quality of drugs provided by LILLY. The reference to being in "heaven" is another reference to drug quality. FNU LNU-2 began to complain about narcotics, probably cocaine ("chicken"), that he had to dry out ("cook") to eliminate the moisture ("oil"). LILLY responded by letting FNU LNU-2 know that he had some new cocaine coming in ("powerhouse"). FNU LNU-2 indicating that if the cocaine was from the same source ("chicken farm") as the cocaine previously supplied by LILLY ("first food") he would take it.

Y.    SHAMIKA TAYLOR Picks Up Cocaine Filled
      Cargo for the Organization

134. As detailed above, this investigation began when
on May 15, 2004, Guyanese authorities intercepted a shipment of
frozen fish consigned to Eye & Eye Produce, using telephone
number of (718) 284-8474.   Further research into Eye & Eye
Produce indicated prior shipments of fish to the United States
from Guyana, including one dated May 7, 2004.   The airway bill on
the May 7, 2004 record also indicates that Eye & Eye Produce used
(718) 284-8474 as its contact number.

135. As part of the investigation, I also researched
import records in which (718) 284-7874 was listed by the
consignee.   My research indicated that on May 14, 2004, a
shipment of fish consigned to SHAMIKA TAYLOR arrived at J.F.K.
from Guyana and that TAYLOR used (718) 284-8474, the same number
used by Eye & Eye Produce.   Further investigation indicates that
TAYLOR picked up the shipment of fish on May 14, 2004.   At the
time of the pick-up, TAYLOR presented a driver's license
confirming her identity to the shipping company.

136. Based on my training, experience and the
investigation to date, I believe that TAYLOR was picking up a
cocaine-filled shipment of fish on behalf of the LILLY
organization.

Z.    SANDY Is a Deliveryman for the Organization

137. Our investigation has also identified RUEL SANDY, who has acted as a driver and deliveryman for the organization, as confirmed by telephone interceptions by ICE agents.  For example, on February 27, 2005, LILLY received a series of calls from SANDY over LILLY PHONE-2, beginning at approximately 12:58 p.m.   During that call, SANDY stated that he was coming over to LILLY's apartment, and he "got the thing."  At 3:08 p.m., SANDY called stating that he was outside LILLY's apartment, and that LILLY should come down.

138. Based upon my training, experience and knowledge of the investigation to date, I believe that SANDY was making a delivery of cocaine or money (the "thing") to LILLY.  Indeed, on other occasions, SANDY and LILLY discussed various locations that SANDY was going to on LILLY's behalf.

139. SANDY also has knowledge of cocaine-laden cargo and couriers utilized by the organization.  For example on March 5, 2005, at approximately 9:48 a.m., a call was received over LILLY PHONE-1 from 347-776-0364, a number used by SANDY.    It appears that SANDY's phone was on, and SANDY somehow dialed LILLY's telephone number by accident.  Once LILLY's phone was dialed, background conversation was heard and recorded on LILLY's voicemail.

140. During this conversation from SANDY's phone, an unknown male stated that he wanted to know the "first thing on,

on American."   The unknown male continued, "the first three after the courier came in . . . on North American.  Her ass up in jail."   The unknown male later stated, "Rupaul is still in the hustling."   The unknown male later asked, "The cargo he has. . North American?"

141. Based upon my training, experience and investigation to date, I believe that the unknown male was having a conversation, in SANDY's presence, regarding cocaine importation.   The reference to the "thing" and the "courier came in on . . . North American" are references to narcotics importation from Guyana.  North American is one of the few airlines that fly to J.F.K. from Guyana and the references to the "thing" and the "courier" are references to cocaine couriers, while "cargo" is a reference to cocaine-laden cargo.  "Her ass in jail" is a reference to one of the couriers that has been arrested as a result of this investigation.  The reference to "Rupaul is still in the hustling" is a reference to KENT BRYAN. Thus, it appears that SANDY was present when a third party was discussing the organization's cocaine importation operation.

142. Additionally, SANDY also discussed aspects of the cocaine smuggling conspiracy directly with LILLY, demonstrating first-hand knowledge of the workings of the organization.  On March 28, 2005, at approximately 4:26 p.m., SANDY received a call from LILLY over LILLY PHONE-2.  During that call, SANDY asked LILLY how the "sealing thing" was coming along.  LILLY told SANDY

that he had to order two more "plates" because the original ones were not sealing properly.   LILLY elaborated that the "plate" was too big by about one inch, and he was waiting for the replacement.

143. Based upon my training, experience and the investigation to date, I believe that SANDY was discussing LILLY's efforts to obtain a canning machine for drug smuggling purposes.   In previous intercepts with DAVID, LILLY discussed obtaining an canning machine.  Additionally, in other intercepted calls with DAVID and HOBBS, LILLY had similar discussions not only concerning canning machines, but also discussing the fact that the plates were an inch off, and the fact that LILLY needed replacement plates.   From my experience investigating Guyanese cocaine traffickers, I know that factory-sealed cans are a popular method of narcotics concealment.   Therefore, the reference by SANDY to the "sealing thing" and the "plates" are references to a canning machine obtained by LILLY.   Apparently, canning machine was not working because the "plate" was too big and LILLY was waiting for a replacement.

WHEREFORE, your deponent requests that arrest warrants be issued for the defendants SHARWIN LILLY, also known as "Nigel Chester" and "Huey," KENT BRYAN, also known as "Rupaul," DERRICK BARTON, MICHAEL BROWNE, LESLYN CAMACHO, HUBERT CLARKE, also known as "Dun Dun," WANDA DELOACH, LENNOX HOBBS, also known as "Junior" and "Ronald Davis," RAWLE HOYTE, TERRELL LASSITER, ROCHELLE

71

MARCUS, TIMOTHY MCKENZIE, also known as "Spliff," SHELLY MCQUNE,

JERMAINE NICHOLSON, MICHAEL REID, TABESSA RODNEY, RUEL SANDY,

SHAMIKA TAYLOR, DERRICK WALTERS, also known as "Patrick

Obermuller," CHRISTOPHER WEST, also known as "Tony," KENNETH

WONG, also known as "Pops," "CHUBBY" LNU, "FREDDY" LNU,

"GARFIELD" LNU, "MOSES" LNU, FNU LNU, also known as "Winsome

Housen" and FNU LNU-2, also known as "Joel Hernandez" so that

they may be dealt with according to the law.

Because of the nature of this application, it is hereby

further requested that this application and the related arrest

warrants be sealed.

JASON MOLINA
Special Agent
Immigration and
Customs Enforcement


Sworn to before me this
1st day of April, 2005


HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK